UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Consolidated Case Nos.
12-20937-CIV-SCOLA    10-21669-CIV-SCOLA

IN RE: PSN USA, Inc.                           (Bankr. Case No. 02-11913-AJC)

    Debtor,

_____/

NOB HOLDINGS, CORP.                            (Bankr. Adv. Pro. No. 08-ap-1602-AJC)

    Appelant,

vs.

DAN FAIR, as Trustee of
PSN LIQUIDATING TRUST

and

LIBERTY MUTUAL INSURANCE                       (Bankr. Adv. Pro. No. 09-ap-2189-AJC)
COMPANY, as surety for the PSN
Liquidating Trustee, Dan Fair,

    Appellees.

_____/

### ORDER ON APPEAL OF BANKRUPTCY
### COURT'S SUMMARY JUDGMENT DECISIONS

      This consolidated bankruptcy appeal arises from the failings of an incompetent trustee and the efforts of an unsecured creditor to hold him and his surety accountable for damages allegedly caused by his incompetence.  The unsecured creditor, NOB Holdings Corporation ("NOB"), instituted adversary proceedings in the bankruptcy court against the trustee, Dan Fair ("Fair"), and his surety, Liberty Mutual Insurance Complaint ("Liberty Mutual"), raising a series of claims relating to Fair's derelictions.  The bankruptcy court entered summary judgment in favor of Fair and Liberty Mutual, finding that although Fair knowingly took action in violation of the debtor's plan and the court's confirmation order, such conduct was not grossly negligent as a matter of law.  The bankruptcy court further held that Fair's violations of court orders did not amount to contempt, and that NOB was not entitled to any damages or attorney's fees.  NOB appeals the bankruptcy court's adverse rulings and, for the reasons explained below, this Court reverses.

**Background**

This dispute has its origins in the bankruptcy of the debtor, Pan American Sports Network ("PSN USA"), more than a decade ago. PSN USA and its parent company, Pan American Sports Network International ("PSN International"), provided broadcasting on the "PSN Channel," a cable sports network offered in Latin American markets. In early 2000, NOB entered into a contract to provide PSN USA with broadcast rights to a South American soccer tournament. Two years later, in March 2002, PSN USA filed for bankruptcy under Chapter 11. PSN USA's First Amended Plan of Reorganization (the "Amended Plan") was filed on November 21, 2002 and was confirmed on December 24, 2002. Fair was appointed as the liquidating trustee under the Amended Plan.

Fair obtained an accounting degree in 1982 from Carroll College, but is not a licensed CPA. He was employed by PSN USA in its accounting department, but had no experience serving as a liquidating trustee and was not familiar with bankruptcy practice or procedure. After his appointment, Fair filed an application to employ Kluger Peretz Kaplan & Berlin ("Kluger") as trustee's counsel. He claims to have leaned heavily on them during the bankruptcy proceedings, even to the point of blindly following their alleged advice at certain times.

On January 8, 2003, Liberty Mutual issued a bond to the bankruptcy court "for the faithful performance by [Fair] of his official duties as the Liquidating Trustee[.]" *See* Bond of Liquidating Trustee (A-296). The bond was issued to "the United States Bankruptcy Court, Southern District of Florida, Miami Division" in the sum of $2 million. *See id.*

On January 6, 2003, a Liquidating Trust Agreement was signed. Section 5.4 of the Liquidating Trust Agreement states that Fair:

> shall not be liable for any error of business judgment with respect to any action taken or omitted to be taken by the Liquidating Trustee in such capacity, unless it shall be proven that the Liquidating Trustee shall have been ***grossly negligent*** or shall have acted with willful misconduct or fraud in ascertaining the pertinent facts or in performing any of the rights, powers or duties hereunder."

*See* PSN Liquidating Trust Agreement at 12 (A-231) (emphasis supplied). Section 4.06 of the Amended Plan similarly limits Fair's liability to acts of gross negligence or willful misconduct. Section 5.5(b) of the Liquidating Trust Agreement further states that "***except as provided in Section 5.4***," Fair "may consult with independent legal counsel to be selected by him," and "shall not be liable for any action taken or omitted to be taken by him in accordance with the

advice of such counsel[.]"  *See* PSN Liquidating Trust Agreement at 12 (A-231) (emphasis supplied).  By its terms, this provision permits an advice of counsel defense, but only so long as the trustee does not commit gross negligence or willful misconduct, per Section 5.4 of the Liquidating Trust Agreement.  Section 5.5 also makes plain that while Fair may rely upon statements and opinions "believed by [him] to be genuine," he nonetheless is "under a duty to have examined the same to determine whether or not such writings conform to the requirements of this Agreement or the Plan."  *See id.*

NOB was the largest unsecured creditor in the bankruptcy.  PSN USA filed an objection to NOB's claim and, on November 30, 2004, Fair submitted an affidavit supporting that objection.  Fair contends that he did so at the request of Kluger.  The purported basis for the objection was that NOB's claim did not arise from a contract with PSN USA, but instead involved a contract with PSN International.  The contract itself was ambiguous, identifying the contracting parties as NOB and "Pan American Sports Network, domiciled at 380 Madison Avenue, New York, NY[.]"  *See* Bankr. Order on Objection to NOB's Claim at 2 (A-332).  Because both PSN USA and PSN International operated under the name "Pan American Sports Network," the name in the contract was not helpful and left only the address of domicile to potentially differentiate between the two.  In his affidavit in support of the objection to NOB's claim, Fair stated that PSN USA operated out of Florida and was not domiciled in New York.  Therefore, according to Fair, NOB's contract, and hence its claim, was not with PSN USA.  These averments proved erroneous, however, and Fair later withdrew his affidavit after it became apparent that PSN USA did actually operate out of New York.  The parties strongly dispute whether Fair knew, or should have known based on information at his disposal, that PSN USA was domiciled in New York well before he submitted the first affidavit to the contrary.  Ultimately, following a hearing in 2005, the bankruptcy court denied the objection to NOB's claim, finding in a detailed order that PSN USA was in fact domiciled in New York.  The bankruptcy court's ruling was affirmed by the district court on appeal.

In the end, Fair proved a deficient trustee in a number of ways.  Although he was "generally familiar with" his duties as trustee under the Amended Plan and other governing documents, *see* Fair Aff. ¶ 12 (A-395), he committed a series of stupendous blunders and acted contrary to the requirements of the Amended Plan and confirmation order throughout the bankruptcy proceedings, *see* Liberty Mutual S.J. Order at 3-4, 8 (A-300 *et seq.*).  He repeatedly relied upon advice of counsel "as to what to do and how to do it."  *See* Fair. Aff. ¶ 12.  He did

not keep the required reserves segregated as required by the Amended Plan, instead using them to pay operating costs, and he did not put those reserves in an interest bearing account because a bank employee told him he could not do so. *See id.* ¶¶ 13, 14. Fair also paid several Kluger invoices, and paid fees to himself, without prior court approval. *See id.* ¶ 15. He did not provide full financial documentation to NOB when requested, instead relying solely upon counsel to fulfill the request. *See id.* ¶ 16. As noted above, he signed an affidavit, purportedly at Kluger's request, supporting the debtor's objection to NOB's claim and stating, incorrectly, that PSN USA did not operate out of New York. *See id.* ¶ 17.

As a consequence of these failings, NOB moved to remove Fair as the liquidating trustee. The bankruptcy court held evidentiary hearings on the motion, and also appointed an examiner, Soneet Kapila (the "Examiner"). On June 22, 2007, the Examiner submitted his report to the bankruptcy court, indicating that Fair "violated numerous Plan provisions" and generally failed to appropriately discharge his duties as trustee. *See* Examiner's Report at 2 (A-776). The Examiner found that Fair "did not possess the background, experience and foundational qualifications required to serve in the fiduciary role of a Liquidating Trustee"; he violated the mandated reserve account, such that funds were used to pay trust administrative fees and costs instead of going to unsecured creditors, rendering the estate insolvent; he "commingled funds and did not segregate the required reserves"; he "paid estate professionals without the requisite court approvals pursuant to the Plan"; and he "did not exercise his fiduciary obligation to maximize the return on available surplus funds," by failing to keep the funds in an interest bearing account. *See id.* at 2-3. The Examiner also found that bankruptcy counsel did not provide Fair with sufficient "overseeing, advice and guidance," but that despite all of his failings, there was no evidence Fair had misappropriated funds. *See id.* at 2.

On June 8, 2007, based on the Examiner's report and its own hearings, the bankruptcy court found that Fair had mismanaged the trust. Nevertheless, the bankruptcy court determined that it was in the best interest of the creditors and the administration of the estate not to remove Fair as trustee, but simply to order him not to make any further disbursements. On NOB's motion, however, the bankruptcy court subsequently ordered a disgorgement of fees that Fair paid to Kluger without court approval. Kluger had voluntary disgorged $324,000 in August 2007, so the order directed counsel to disgorge a remaining shortfall of $165,691. The bankruptcy court did not order Fair to disgorge any of the fees that he had received.

NOB initiated an adversary proceeding against Fair and Kluger on September 22, 2008, and against Liberty Mutual on October 16, 2009. NOB later voluntarily dismissed its claim against Kluger. NOB alleged that Fair was liable for "Contempt of Court" (Count I), "Bad Faith Submission of a False Affidavit" (Count II), "Bad Faith Litigation and Concealment of Misconduct" (Count III), "Gross Negligence, Wilful Misconduct and/or Fraud" (Count IV), and "Gross Negligence" (Count V). *See* Third Am. Compl. at 77-93 (A-82 *et seq.*). NOB also alleged claims against Liberty Mutual for "Liability of a Surety" (Count I) and for "Attorneys' Fees under Florida Statutes § 627.428" (Count II). *See* Compl. at 7-8 (A-283). The two adversary actions were consolidated on January 21, 2010.

Liberty Mutual filed a motion for summary judgment on NOB's complaint, to which NOB failed to timely respond. The bankruptcy court held a hearing on Liberty Mutual's motion on March 4, 2010, just prior to which NOB filed its own motion for partial summary judgment. One day after the hearing, NOB also requested extra time to file a response to Liberty Mutual's motion, but the bankruptcy court declined to allow it. In ruling on the summary judgment motions, the bankruptcy court determined that Fair's misdeeds did not rise to the level of gross misconduct and, as such, neither Fair nor Liberty Mutual could be held liable. The bankruptcy court also found Fair was not liable for contempt because, even though he failed to follow the Amended Plan and confirmation order, he did not willfully violate them.

## **Jurisdiction**

The federal district courts have appellate jurisdiction over "final judgments, orders, and decrees" entered by bankruptcy judges. *In re Charter Co.*, 778 F.2d 617, 621 (11th Cir. 1985) (quoting 28 U.S.C. § 158(a)(1)); *see also Figueroa v. Wells Fargo Bank N.A.*, 382 B.R. 814, 820 (S.D. Fla. 2007) (Gold, J.). "Courts consistently consider finality in a more pragmatic and less technical way in bankruptcy cases than in other situations." *In re Jove Eng'g, Inc.*, 92 F.3d 1539, 1547 (11th Cir. 1996) (citation and alteration omitted). The Eleventh Circuit has said that "any order within a bankruptcy case that concludes a particular adversary proceeding should be deemed final and reviewable." *In re Martin Bros. Toolmakers, Inc.*, 796 F.2d 1435, 1437 (11th Cir. 1986). In this case, the bankruptcy court's summary judgment decisions concluded NOB's adversary proceedings against Fair and Liberty Mutual in their entirety. Therefore, this Court has jurisdiction over NOB's consolidated appeal pursuant to 28 U.S.C. § 158(a)(1).

**Standard of Review**

The district court functions as an appellate court in reviewing federal bankruptcy court decisions. *In re Colortex Indus., Inc.*, 19 F.3d 1371, 1374 (11th Cir. 1994). Typically in bankruptcy appeals, the district court reviews all legal rulings *de novo* and all findings of fact for clear error. *In re Globe Mfg. Corp.*, 567 F.3d 1291, 1296 (11th Cir. 2009). Where, as here, the bankruptcy court's summary judgment orders are under review, the district court applies only the *de novo* standard because summary judgment "by definition involves no findings of fact," and, thus, the applicable legal standard cannot be "anything other than *de novo*." *In re Optical Techs., Inc.*, 246 F.3d 1332, 1335 (11th Cir. 2001).

In determining whether summary judgment was appropriate, the reviewing court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *In re Shelton*, 481 F. App'x 520, 522 (11th Cir. 2012). "It is axiomatic that a bankruptcy court deciding a summary judgment motion, just like a district court, must determine whether there are any genuine issues of material fact." *In re Optical Techs., Inc.*, 246 F.3d at 1334; *Carey Lumber Co. v. Bell*, 615 F.2d 370, 378 (11th Cir. 1980). And, "[l]ike a district court, a bankruptcy court may only grant summary judgment where there is no genuine issue of material fact." *In re Optical Techs., Inc.*, 246 F.3d at 1334 (citing Fed. R. Civ. P. 56(c)).

**Legal Analysis**

This Court reverses the bankruptcy court's summary judgment rulings because: there is a genuine issue of material fact as to whether Fair's actions amounted to gross negligence; the bankruptcy court improperly treated advice of counsel as an absolute defense to Fair's conduct; it erred in finding that NOB lacked standing to proceed against Liberty Mutual; it erred in ruling that Fair could not be held liable for contempt unless he subjectively intended to violate court orders; and it erred in concluding that NOB could not collect damages or attorney's fees.

    **I.    Gross Negligence**

"There is no question that a bankruptcy trustee may be held personally liable for breach of his fiduciary duty," and "[s]uch liability may attach as a result of negligent, as well as knowing or intentional violations of [his] fiduciary duties." *In re George Schumann Tire & Battery Co.*, 145 B.R. 104, 107 (Bankr. M.D. Fla. 1992) (Paskay, J.); *see also Red Carpet Corp. of Panama City Beach v. Miller*, 708 F.2d 1576, 1578 (11th Cir. 1983). Here, the Amended

Plan and Liquidating Trust Agreement provided that Fair could be held liable only for gross negligence, or willful misconduct or fraud, in the performance of his duties.[1]

The bankruptcy court ruled that "for Fair's conduct to be considered grossly negligent, NOB must establish that Fair 'willfully and deliberately' attempted to cause harm to [it]." *See* Liberty Mutual S.J. Order at 7 (A-306). That is incorrect. Gross negligence requires "[a] lack of slight diligence or care," marked by "[a] conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party[.]" *See* Black's Law Dictionary 1135 (9th ed. 2009); *Splitt v. Deltona Corp.*, 662 F.2d 1142, 1146 (5th Cir. 1981). Under the Amended Plan and Liquidating Trust Agreement, liability may be imposed for gross negligence *or* willful misconduct. Willfulness is not an element of gross negligence; the standards of liability are separate. Indeed, as other courts have explained, gross negligence "[s]tand[s] between the requisite culpability for 'willful and wanton' conduct and simple negligence," and "is best described as an act or omission which a reasonable, prudent person would know is likely to result in harm to another." *Livingston v. H.I. Family Suites, Inc.*, 2006 WL 1406587, at *5 (M.D. Fla. May 22, 2006) (Fawsett, C.J.) (quoting *Eller v. Shova*, 630 So. 2d 537, 541 n.3 (Fla. 1993)). Thus, there is no requirement that a party willfully or deliberately try to harm someone else; it is enough that "a reasonable and prudent man would know [his conduct] would probably and most likely result in injury to persons or property." *See Boyce v. Pi Kappa*

---

[1] Following the Supreme Court's decision in *Mosser v. Darrow*, 341 U.S. 267 (1951), "a circuit split developed on the question of the proper standard of care to which a trustee should be held." *See In re Smyth*, 207 F.3d 758, 761 (5th Cir. 2000). Several circuits have ruled that a bankruptcy trustee cannot be held personally liable unless he acts willfully and deliberately in violation of his fiduciary duties. *See, e.g.*, *In re Chicago Pacific Corp.*, 773 F.2d 909, 915 (7th Cir. 1985); *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 461-62 (6th Cir. 1982); *Sherr v. Winkler*, 552 F.2d 1367, 1375 (10th Cir. 1977). Other circuits have said that liability may be imposed for mere negligence. *See, e.g.*, *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1357 (9th Cir. 1983). Still other courts have attempted to strike a middle ground, adopting "an intermediate position" that requires a showing of gross negligence. *See, e.g.*, *In re Smyth*, 207 F.3d 758, 761; *In re J.F.D. Enterprises, Inc.*, 236 B.R. 112 (D. Mass. 1999).

In *Red Carpet Corp. of Panama City Beach v. Miller*, 708 F.2d 1576, 1578 (11th Cir. 1983), the Eleventh Circuit stated that "[a] bankruptcy trustee is liable for wrongful conduct or negligence." However, that general statement was made as the court considered whether a debtor could hold its former counsel personally liable for negligence; the case did not involve the liability of a bankruptcy trustee. This Court is unaware of any subsequent definitive pronouncements from our Court of Appeals regarding what standard governs trustee liability. *See In re R & W Enters.*, 181 B.R. 624, 634 n.7 (Bankr. N.D. Fla. 1994) (Cohen, J.). Even so, this Court need not wade into the debate today, as the Amended Plan and Liquidating Trust Agreement set forth the applicable standard by which this trustee, Fair, is to be judged. As noted above, those documents provide that liability may be imposed only for gross negligence or willful and wanton misconduct.

*Alpha Holding Corp.*, 476 F.2d 447, 452 (5th Cir. 1973); *see also Sperry Assocs. Fed. Credit Union v. Space Coast Credit Union*, 877 F. Supp. 2d 1227, 1237 (M.D. Fla. 2012) (Honeywell, J.) (defendant is grossly negligent if he has "knowledge of the existence of circumstances constituting a clear and present danger and yet still undertakes a conscious, voluntary act or omission which *is likely to* result in injury.") (emphasis supplied).

Applying the wrong legal standard, the bankruptcy court found there was no proof that "Fair acted deliberately or with the intent to harm NOB or the Estate through his decisions as Liquidating Trustee." *See* Liberty Mutual S.J. Order at 7-8 (A-306). Accordingly, the bankruptcy court ruled that Fair, and by extension Liberty Mutual, could not be held liable because Fair's derelictions did not amount to gross negligence as a matter of law. This Court disagrees that Fair's liability may be resolved as a matter of law at the summary judgment stage. Instead, the Court finds there is a genuine issue of material fact precluding summary judgment as to whether Fair was grossly negligent in carrying out his duties as bankruptcy trustee.[2]

Fair admits that he was only "generally familiar with" his duties as trustee and that he repeatedly and heavily relied upon advice of counsel "as to what to do and how to do it." *See* Fair Aff. ¶ 12 (A-395). He did not keep the required reserves segregated as mandated by the Amended Plan, instead using them to pay operating costs, and he did not put those reserves in an interest bearing account because a bank employee told him he could not do so. *See id.* ¶¶ 13, 14. Fair also paid several Kluger invoices, and paid fees to himself, without prior court approval. *See id.* ¶ 15. He did not provide full financial documentation to NOB when

---

[2] Although NOB failed to respond to Liberty Mutual's motion, that does not mean Liberty Mutual was automatically entitled to summary judgment. In *United States v. One Piece of Property*, *5800 S.W. 4th Ave., Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004), the Eleventh Circuit held that "[t]he district court cannot base entry of summary judgment on the mere fact that the motion was unopposed but, rather, must consider the merits of the motion." The court observed that Federal Rule of Civil Procedure 56(e) provides that where "the adverse party does not respond, summary judgment, *if appropriate*, shall be entered against the adverse party." *See id.* (citation omitted; emphasis original). The Eleventh Circuit determined that summary judgment is appropriate, even where the opposition fails to respond, only if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See id.* (quoting Fed. R. Civ. P. 56(c)). In deciding a summary judgment motion, "[t]he court need consider only the cited materials, but it may [also] consider other materials in the record." *See* Fed. R. Civ. P. 56(c)(3). In this case, the Court has considered not just the evidence presented by Fair and Liberty Mutual, but also the other evidence in the record. Such record evidence clearly shows there is a genuine issue for trial as to Fair's liability for gross negligence. In fact, there is arguably a genuine issue of fact within his own affidavit, which outlines his missteps as trustee. The significance of those missteps cannot be determined on summary judgment.

requested, instead relying solely upon counsel to fulfill the request. *See id.* ¶ 16. He also signed an affidavit, purportedly at counsel's request, supporting the debtor's objection to NOB's claim and stating, mistakenly, that PSN USA was not domiciled in New York. *See id.* ¶ 17. In addition, the Examiner appointed by the bankruptcy court found that Fair "did not possess the background, experience and foundational qualifications required to serve in the fiduciary role of a Liquidating Trustee"; that he violated the mandated reserve account, such that funds were used to pay trust administrative fees and costs instead of going to unsecured creditors, rendering the estate insolvent; that he "commingled funds and did not segregate the required reserves"; that he "paid estate professionals without the requisite court approvals pursuant to the Plan"; and that he failed to place funds in an interest bearing account in violation of "his fiduciary obligation to maximize the return on available surplus funds." *See* Examiner's Report at 2-3 (A-776).

The bankruptcy court essentially downplayed each of these failings, attributing them to Fair's stupidity, or incompetence, or both. The bankruptcy court also appears to have made credibility judgments in finding that Fair acted in good faith and without the intent to harm NOB or anyone else. The bankruptcy court should not have done so. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007) (court cannot weigh facts on summary judgment or construe them against the non-movant); *see also Alabama Farm Bureau Mut. Cas. Co., Inc. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 609 (5th Cir. 1979) ("Cases in which the underlying issue is one of motivation, intent, or some other subjective fact are particularly inappropriate for summary judgment, as are those in which the issues turn on the credibility of the affiants.") (citation omitted).

To affirm the bankruptcy court, this Court would have to conclude that no rational trier of fact could find Fair's actions grossly negligent. *See Simpson & Creasy, P.C. v. Cont'l Cas. Co.*, 453 F. App'x 868, 871 (11th Cir. 2011) (summary judgment is appropriate "if no reasonable jury could find for the non-moving party"); *Santana v. City of Hialeah*, 2009 WL 6635306, at *4 (S.D. Fla. Nov. 30, 2009) (Gold, J.) ("a grant of summary judgment is appropriate in negligence cases where no reasonable jury could conclude that the defendant breached a duty of care owed to the plaintiff"). On the present record, the Court is unable to reach that conclusion. Although the Court cannot say that any one of Fair's misdeeds amounted to gross negligence, or that they collectively rise to that level, there is at least a question for trial – especially considering that NOB need not show Fair acted willfully, or with the subjective intent to injure NOB or the bankruptcy estate. Perhaps, after a full hearing on the merits, the trier of fact will

find that Fair was not negligent at all, or that his negligence was just ordinary and not gross. But in cases where the line separating simple and gross negligence is doubtful and indistinct, the question of whether a defendant's conduct falls on one side of the line or the other must be resolved at trial. *See Hager v. Live Nation Motor Sports*, 665 F. Supp. 2d 1290, 1294-95 (S.D. Fla. 2009) (King, J.); *Courtney v. Fla. Transformer, Inc.*, 549 So. 2d 1061, 1065 (Fla. 1st DCA 1989); *Russell v. Dalby*, 573 So. 2d 133, 133 (Fla. 2d DCA 1991).

## II.  Advice of Counsel Defense

The bankruptcy court concluded that even if Fair was grossly negligent, he could not be held liable because he relied upon advice of counsel in carrying out his functions as trustee. Courts have recognized the advice of counsel defense in a variety of contexts. *See, e.g.*, *S.E.C. v. Huff*, 758 F. Supp. 2d 1288, 1348 (S.D. Fla. 2010) (Rosenbaum, J.); *Athanason v. Hubbard*, 218 So. 2d 475, 478 (Fla. 2d DCA 1969).

Advice of counsel is not an absolute defense, however. *See, e.g.*, *In re Dubrowsky*, 244 B.R. 560, 575 (E.D.N.Y. 2000) (Spatt, J.) ("'reliance upon advice of counsel' is not an impenetrable shield"); *Rea v. Wichita Mortg. Corp.*, 747 F.2d 567, 576 (10th Cir. 1984) ("reliance on the advice of legal counsel is recognized as a valid defense in both civil and criminal contexts," and "[w]hile such reliance is not an absolute defense, it is a factor to be considered in determining a defendant's good faith, willfulness, or illegal intent"); *see also In re Phillips*, 2011 WL 1196427, at *19 (M.D. Fla. Mar. 29, 2011) (Steele, J.) ("The advice of counsel is not a defense when the erroneous information should have been evident to the debtor. A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath.") (citation omitted); *LNC Invests., Inc. v. First Fidelity Bank*, 1997 WL 528283, at *22 (S.D.N.Y. Aug. 27, 1997) (Mukasey, J.) ("While the taking of advice of counsel or other specialist has some effect in tending to show the use of reasonable care by a trustee, it is not conclusive. The trustee has a duty to examine the opinion of the specialist so far as the ability of a reasonably intelligent man would permit and to exercise what judgment he can as to its soundness.") (quoting George G. Bogert & George T. Bogert, *The Law of Trusts and Trustees* § 541 (2d ed. 1993)); Restatement (Second) of Trusts § 201 cmt. b (1959) (negligent trustee who misinterprets trust documents "is not protected from liability merely because he acts in good faith, nor is he protected merely because he relies upon the advice of counsel").

Here, the bankruptcy court erred in effectively deeming advice of counsel an absolute defense to NOB's claims. In so doing, the bankruptcy court overlooked the interplay between the limitation of liability provisions in the Liquidating Trust Agreement. Under the bankruptcy court's reading, Fair was shielded by advice of counsel *even if* his actions amounted to gross negligence. Under the clear terms of the Liquidating Trust Agreement, however, advice of counsel was a viable defense *only if* Fair's conduct did not otherwise amount to gross negligence or willful misconduct:

> Section 5.4   <u>Liability of the Liquidating Trustee.</u>   The Liquidating Trustee shall not be liable for any error of business judgment with respect to any action taken or omitted to be taken by the Liquidating Trustee in such capacity, ***unless it shall be proven that the Liquidating Trustee shall have been grossly negligent or shall have acted with willful misconduct or fraud*** in ascertaining the pertinent facts or in performing any of the rights, powers or duties hereunder. . . .
>
> Section 5.5   <u>Reliance of the Liquidating Trustee.</u>   ***Except as provided in Section 5.4***:
>
> * * *
>
> (b)   the Liquidating Trustee may consult with independent legal counsel to be selected by him, and ***the Liquidating Trustee shall not be liable for any action taken or omitted to be taken by him in accordance with the advice of such counsel***[.]

*See* Liquidating Trust Agreement at 12 (A-231) (emphasis supplied). The inclusion of the prefatory phrase "[e]xcept as provided in Section 5.4," before the advice of counsel provision, makes plain that the trustee may raise an advice of counsel defense *only if* his conduct does not amount to gross negligence or willful misconduct.

Thus, Fair was not absolutely protected from liability by advice of counsel, and it was error to grant summary judgment on that basis. Fair may raise advice of counsel as a defense at trial, but he still must show his actions were not otherwise grossly negligent. The extent to which this defense will shield him from other-than-grossly-negligent conduct is bound up in factual questions to be resolved at trial. *See, e.g., Fuentes v. CAI Int'l, Inc.*, 728 F. Supp. 2d 1347, 1358-59 (S.D. Fla. 2010) (O'Sullivan, J.) ("Disputed fact questions exist as to what advice was sought, what disclosures were made by the defendants to their counsel, whether the legal advice was reasonable, and whether the defendants strictly complied with the legal advice. The defendants are not entitled to summary judgment on their good faith defense based on advice of counsel."); *LNC Invest.*, 1997 WL 528283, at *22 (summary judgment precluded on advice of

counsel defense because questions of fact existed as to what disclosures were made to counsel and whether trustees actually relied upon the advice given; moreover, even absent such factual issues, advice of counsel would not be "a complete defense as a matter of law," because "[a] trier of fact must find that reliance reasonable, such that the trustees acted as reasonably prudent people").

### III.    Surety's Liability

"[T]he leading treatise on bankruptcy law, Collier on Bankruptcy, states without qualification, '[w]hen a trustee negligently performs the trustee's duties, liability under the bond is activated.'"  *See In re Schooler*, 449 B.R. 502, 524 (Bankr. N.D. Tex. 2010) (Jones, J.) (quoting 3 Collier on Bankruptcy ¶ 322.02[2]); *In re George Schumann Tire & Battery*, 145 B.R. at 107.   Nevertheless, the bankruptcy court found that even if Fair was grossly negligent, NOB lacked standing to hold Liberty Mutual liable because the bond was issued for the benefit of "the United States Bankruptcy Court, Southern District of Florida, Miami Division" and NOB is not named as an obligee on the bond.   In so ruling, the bankruptcy court erred.

"The Bankruptcy Code and Rule 17 of the Federal Rules of Procedure each have liberal standing provisions, designed to allow a party to appear as long as it has a direct stake in the litigation under the particular circumstances."   *See Greer v. O'Dell*, 305 F.3d 1297, 1302 (11th Cir. 2002).   Bankruptcy Rule 2010(b) expressly permits "any party in interest" to bring an action on the trustee's bond "in the name of the United States for the use of the entity injured by the breach of the condition."   NOB filed its adversary proceeding against Liberty Mutual "in the name of the United States," *see* Complaint ¶ 5 (A-278), and, as an unsecured creditor, it is clearly a real party in interest under the circumstances of this case.   As such, NOB has standing to proceed against Liberty Mutual on the bond.

Because Liberty Mutual's bond runs in favor of the United States, however, any damages must inure to the bankruptcy estate as a whole and not directly to any specific creditor, such as NOB.   *See In re Schooler*, 449 B.R. at 524 ("The bond, however, runs in favor of the United States, and is to cover any loss resulting to the bankruptcy estate. It is not issued to cover specific creditors.   The Court therefore directs that Liberty Mutual's obligation is satisfied by remitting the loss amount to the bankruptcy estate for ultimate distribution to creditors of the bankruptcy estate."); *In re R. Woolsey & Assocs., Inc.*, 454 B.R. 782, 785-86 (Bankr. D. Idaho 2011) (Myers, J.) ("The purpose of the bond is to assure faithful performance by the trustee and to indemnify the estate for any loss that might be sustained as a result of the

misfeasance or malfeasance of the trustee.") (citations omitted). Therefore, while NOB may proceed against Liberty Mutual on the bond and may hold Liberty Mutual liable for Fair's gross negligence, if any, NOB is not directly entitled to a damage award from Liberty Mutual. Instead, such damages, if any, must inure to the bankruptcy estate, with appropriate disposition to follow under the terms of the Amended Plan. *See In re Schooler*, 449 B.R. at 524.

### IV.    Contempt

The bankruptcy court ruled that Fair could not be held in contempt because he did not willfully and knowingly violate any court orders. Although Fair did not adhere to the Amended Plan and confirmation order, the bankruptcy court determined his failings were not purposeful. Rather, the court found that any non-compliance was excused because Fair's efforts to comply were undertaken in good faith.

In ruling as it did, the bankruptcy court misapplied the law. "In order to be found in civil contempt, the offending party must have knowingly and willfully violated a definite and specific court order." *In re Turner*, 221 B.R. 920, 925 (Bankr. M.D. Fla. 1998) (Proctor, J.). In this context, however, willfulness does not require a subjective intent to violate the order. It is enough that the party knew the court order was in effect and "intended the actions which violated [it]." *See In re Jove Eng'g*, 92 F.3d at 1555. Indeed, "the focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue." *See Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990).

Under this standard, the bankruptcy court's ruling must be reversed. No one disputes that Fair was aware of the Liquidating Trust Agreement, the Amended Plan, and the bankruptcy court's confirmation order. In fact, he admits that he read them. *See* Fair Aff. ¶ 12. He also admits that he failed to comply with their terms. For example, he "did not keep the required reserves segregated as required by the Plan but used them from time to time to pay operating costs." *See id.* ¶ 13. He "also did not put the reserve funds into an interest bearing account as required by the Plan." *See id.* ¶ 14. Further, he paid several Kluger invoices, and paid fees to himself, without prior court approval. *See id.* ¶ 15. Nor did he provide full financial documentation to NOB when requested, relying instead upon counsel to fulfill the request. *See id.* ¶ 16. In these ways, among others, Fair failed to comply with the terms of the Amended Plan and confirmation order. That such violations were purportedly "inadvertent," and the result of "simple mistakes," *see id.* ¶¶ 20, 24, does not matter. So long as Fair "intended the

actions which violated [the Amended Plan and confirmation order]," that is enough. *See In re Jove Eng'g*, 92 F.3d at 1555.

Based on the foregoing, it appears that NOB is entitled to a ruling in its favor on the contempt charge. Nevertheless, as this matter is being sent back anyway, the prudent course is to permit the bankruptcy court to rule on this claim on remand and, to the extent warranted, to convene a hearing before holding Fair in contempt. *See Campos v. City of Naples*, 202 F. App'x 381, 385 (11th Cir. 2006) ("sanctions designed to compensate one party for expenses incurred due to the opposing party's misconduct is in the nature of civil contempt, requiring notice and the opportunity to be heard prior to the award"); *but see Mercer v. Mitchell*, 908 F.2d 763, 769 n.11 (11th Cir. 1990) ("when there are no disputed factual matters that require an evidentiary hearing, the court might properly dispense with the hearing prior to finding the defendant in contempt and sanctioning him"). This cautious approach will ensure that Fair is afforded full due process and an opportunity to defend his actions, if he can, under the appropriate legal framework set forth above.

## V.    Damages, Attorney's Fees, and Sanctions

Having ruled that Fair was not liable as a matter of law, the bankruptcy court also found no basis to award damages to NOB:

> [T]he only damages that NOB claims are the additional, renegotiated attorneys' fees incurred by NOB that resulted from the prosecution of its claim and responding to the objection to that claim. But in order for the additional fees to be chargeable to Liberty, the Court would have to conclude that Fair pursued the Debtor's objections to NOB's claim in a grossly negligent, willful or fraudulent way. The Court does not reach that conclusion.

Because this Court has determined there is a genuine issue for trial as to liability, the bankruptcy court's damages ruling must be reversed as well.

NOB's damages claims must be kept separate from its attorney's fee claims. This is important because, as noted above, any damages obtained from Liberty Mutual must inure to the estate as a whole. That does not mean, however, that NOB is precluded from collecting attorney's fees from Liberty Mutual, if there is some independent basis for an award in statute, rule, or contract. *See In re Martinez*, 416 F.3d 1286, 1288 (11th Cir. 2005) ("Generally, in federal litigation, including bankruptcy litigation, a prevailing litigant may not collect an attorney's fee from his opponent unless authorized by either a federal statute or an enforceable

contract between the parties."). Determination of entitlement to attorney's fees, should there be a finding of liability, is best left to the bankruptcy court on remand.

As to damages, the Court does not agree with the bankruptcy court's finding that both NOB and the estate sustained no losses merely because Kluger ultimately disgorged its fees and all required distributions were eventually made pursuant to the Amended Plan. The record shows that Fair's actions caused a delay in distributions being made to creditors and that money was being paid to Kluger when it otherwise should not have been. The Court therefore agrees with NOB's argument that it may be entitled to interest on the funds wrongfully employed and withheld by Fair in the course of the proceedings, if such acts can be linked to his gross negligence, and if otherwise supported.

In addition, NOB may be entitled to some compensation if Fair is found in contempt on remand. "The purpose of civil contempt sanctions is to (1) compensate the complainant for losses and expenses it incurred because of the contemptuous act, and (2) coerce the contemnor into complying with the court order." *In re Jove Eng'g*, 92 F.3d at 1557. Clearly, coercive sanctions are off the table since Fair and Kluger ultimately complied with the Amended Plan and the bankruptcy court's confirmation order. One cannot be coerced to do that which he has already done. Under such circumstances, "coercive" sanctions would serve only to punish. *See Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1530 (11th Cir. 1992) ("when civil contempt sanctions lose their coercive effect, they become punitive and violate the contemnor's due process rights"); *In re Jove Eng'g*, 92 F.3d at 1558 ("Sanctions imposed for civil contempt to coerce compliance 'cannot be any greater than necessary to ensure such compliance' and may not be so excessive as to be punitive[.]"). That leaves only compensatory sanctions – that is, sanctions designed to compensate NOB for its efforts in obtaining Fair's compliance and for any other losses or expenses incurred because of the contempt. The bankruptcy court found that such sanctions were not justified because "a motion for contempt is not the avenue to travel to seek reimbursement of attorneys' fees and costs." *See* Fair S.J. Order at 10 (A-325). That proposition is erroneous.

"[A]n award of attorney fees to the injured party in a civil contempt case is within the district court's discretion," and "reimbursement to a prevailing movant may include 'expenses reasonably and necessarily incurred in the attempt to enforce compliance.'" *See Sizzler Fam. Steak Houses v. W. Sizzlin Steak House*, 793 F.2d 1529, 1534 (11th Cir. 1986); *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1310 (11th Cir. 2008). Indeed, the court has broad

discretion to award fees and costs to the prosecuting party, regardless of whether they are otherwise recoverable. *See New Eng. Tech., Inc. v. Sigma Tech Sales, Inc.*, 2011 WL 4014346, at *2 (S.D. Fla. Sept. 9, 2011) (Rosenbaum, J.); *Nat'l Union Fire Ins. Co. v. Olympia Holding Corp.*, 140 F. App'x 860, 864 n.1 (11th Cir. 2005) (civil contempt sanctions not equivalent to typical payment of attorney's fees and do not require use of the lodestar method: "[w]e yield to the broad discretion enjoyed by district courts in fashioning sanctions for civil contempt[.]").

To that end, while Fair argues NOB failed to establish it suffered any damages stemming from his conduct as trustee, that fact – even if true – would not deprive the bankruptcy court of the ability to appropriately compensate NOB for its efforts in obtaining Fair's compliance with the Amended Plan and confirmation order. As the Eleventh Circuit explained in a similar context:

> [Defendant] acknowledges that contempt may serve two purposes. It "can be either coercive, which is intended to make the recalcitrant party comply, or compensatory, which 'reimburses the injured party for the losses and expenses incurred because of his adversary's noncompliance[.]'" [Defendant] suggests, however, that the contempt judgment in this case served neither purpose. It could not have been coercive, [defendant] argues, because [defendant] had cured or had taken steps to cure all the violations reported by [plaintiff] by the time the contempt judgment was entered. It could not have been compensatory, the [defendant] continues, because [plaintiff] submitted no proof of damage caused by [its] allegedly contemptuous conduct. Although the district court stated that the sanction of $25,000 was intended to compensate [plaintiff] for expenses it incurred in policing [defendant's] compliance, [defendant] argues that these expenses were not actually brought about by [defendant's] failure to comply. Since [plaintiff] would have incurred the expenses whether or not it found any violations, [defendant] contends, it cannot be said that [plaintiff] incurred the expenses *because of* the violations.
>
> We believe that the district court's judgment of contempt and the accompanying sanction served a valid compensatory purpose. [Defendant's] argument that [plaintiff's] expenses were not incurred "because of" the violations, while ingenious, cuts so broadly that accepting it would require us to ignore both binding precedent and common sense. . . . Under our precedents, however, an award of attorney fees to the injured party in a civil contempt case is within the district court's discretion. Indeed, reimbursement to a prevailing movant may include "expenses reasonably and necessarily incurred in the attempt to enforce compliance." This rule is sensible as well as binding. It provides parties with an added incentive to monitor and enforce an opponent's compliance with a court order by allowing them to recover their expenses in exposing noncompliance. Yet by conditioning reimbursement on enforcement success, it discourages parties from wasting resources on scavenging for nonexistent violations.

> Each party to a court order is responsible for ensuring its own compliance with that order and for shouldering the cost of compliance. [Defendant] did not fulfill this responsibility. It admits to numerous violations which it did not discover or correct until after [plaintiff] moved for contempt. That [defendant] may have acted to correct the violations after learning of them does not change the fact that [defendant] failed to mount and pay for its own effective enforcement efforts. Rather than let [defendant] freeload off the efforts of [plaintiff], the district court found [defendant] in contempt and imposed a modest sanction. . . . We find no abuse of discretion in the court's finding of contempt or its decision to impose a sanction.

*Sizzler Fam. Steak Houses*, 793 F.2d at 1534-35 (citations and footnotes omitted). Therefore, if Fair is found in contempt, the bankruptcy court has the discretion to compensate NOB for ensuring Fair's compliance.

With these principles in mind, upon any finding of liability at trial, the bankruptcy court shall be left to determine damages, attorney's fees, and/or compensatory sanctions as appropriate.

## Conclusion

For the reasons explained above, the bankruptcy court's summary judgment rulings are **REVERSED** and this matter is **REMANDED** for further proceedings consistent with this Order. The Clerk shall **CLOSE** this case.

**DONE and ORDERED** in chambers in Miami, Florida on February 27, 2013.

                                                         ROBERT N. SCOLA, JR.
                                                         UNITED STATES DISTRICT JUDGE

*Copies to:*
Counsel of Record
Bankruptcy Judge